The next matter is case number 161348, Packgen v. Berry Plastics Corporation et al. Good morning, your honors. Good morning, Mr. Hodes. I would like to reserve two minutes for rebuttal. You may. Thank you. May it please the court. My name is Jonathan Dunant. I am here on behalf of the appellants, Berry Plastics Corporation and Covenant Specialty Coatings, LLC. I refer to them collectively as Berry. The district court erred in three significant ways in this case. First, by denying Berry's motion to exclude plaintiff's financial expert, Mark Feller, despite fatal infirmities in his opinions. Second, by allowing impermissible hearsay testimony at trial. And third, by denying Berry's post-trial motions in which it sought relief from the court's admission of Mr. Feller's testimony and an impermissible hearsay. What's the standard of review on the gatekeeping issue? The law position on the gatekeeping issue would be deniable because the court abdicated its role as the gatekeeper here. Although the court did hold two days of hearings and also issued a 47-page opinion, the court clearly So why don't we go back to the normal abuse of discretion? Even if we apply the abuse of discretion, Your Honor, we would argue that there was meaningful error in the judgment that is sufficient to overturn the court's decision on the Daubert motion. Okay, so what is that error? The court allowed Mr. Feller to testify to what was largely Ipsa Dixit opinions. Let me start with this. Can you go back a minute? The first thing that I think you're claiming is that he was not an expert. We claimed below that he was not an expert, but here we have not. So you agree that he was an expert? We agree that he was an expert. So you're claiming that his opinion isn't worth what was given by the court? We essentially argue that his opinions are what we refer to as accounting alchemy. There are two different aspects of his damages. One refers to refineries that the plaintiff, Pacjen, felt that they were going to sell their products to. These are 37 refineries to whom they never sold products. Well, they had sold products, but Mr. Feller ignored that part and said that because it's a new product that they're now selling, he's going to ignore the historical basis and he's going to decide whether they're going to sell this new product. But he didn't do a survey. He didn't do any analysis of what the potential purchases of those refiners would be. He decided it would be... Well, they say, and maybe this is not what you think he should have surveyed, but they say if the purpose of the survey was to find out what they might have purchased absent this product failure, how can you do that if the product failure had occurred, the reputation had been sullied? You couldn't really do a meaningful market survey under those circumstances. Do you have something else in mind for what the market survey should have been? Well, we would argue that had they done a survey... First of all, we don't know what that would have been because they didn't do it. Mr. Feller admitted on the stand he didn't know what survey he would have said. In fact... You're insisting that what should have been done. You must have some idea of what that should have been. Well, in his dowry hearing, Mr. Feller stated that if a survey had been done, they might have even said, the refiners might have even said, Pacjen who? Pacjen is the plaintiff. And Mr. Feller suggested that he didn't know what a survey would result in. Some of the refiners might have even said, Pacjen who? As in, they wouldn't have known who this plaintiff was. Well, if they wouldn't have known who this plaintiff was, these six months of marketing that he relies on for his one in ten probability clearly weren't as successful as he thought they were. And surveys are done regularly. It could be designed in a manner that could not mention Pacjen, not mention this product, but at least attempt to find out whether the industry was amenable to a product other than these serious heavy metal containers that they've been using for the catalyst. But we don't know because none of it was done. We never get from, we never get to causation. We have an idea that they had said, and we'll get to this in a hearsay, that the refineries said they were going to buy and they never did. But we don't know why. We don't actually know that they were going to buy the refineries. But importantly, Mr. Feller says he didn't listen to his client on this in terms of they thought they had an 80 to 90 percent success rate. He thought they would have a one in ten success rate. But that one in ten success rate is purely his ipsed exit. Mr. Feller provided nothing to get to that one in ten. He says, I didn't listen to the people at Pacjen because I thought that was too high. I didn't see any facts that support that. I think it's one in ten. But he provides no facts to support the one in ten either. And when he testified at his deposition and at the Dowdard hearing, he wanted something that was small and not inconsequential. At his deposition he said he thought 10 percent, there was a 10 percent chance he wouldn't have brought his umbrella. That's how he got to this one in ten chance of selling to the refineries. There is nothing to support this one in ten chance. In the Fishman case, it's described as a probabilistic determination. Now, the Judge Woodcock in his decision, he does identify all of the factual material that went into that probabilistic determination. You may, I guess you feel that all that data that Mr. Feller relied upon does not yield a methodology that works here, that's accepted or established. But Mr. Woodcock does suggest that Mr. Feller went into a fairly detailed, but a factual analysis before he arrived at this probabilistic determination. But the one in ten, the material that Mr. Feller relied on was based on mostly internal documents of Hatchet. We're looking at the decision-making of a third party of the refineries. He hasn't looked at the decision-making of the refineries, which is what would dictate whether it's one in ten, one in twenty, etc. There is no evidence, there's nothing to support the one in ten. It is one in ten because Mr. Feller says so. Did you cross-examine Mr. Feller on these issues? Excuse me? Did you cross-examine Mr. Feller on these issues? We did at the trial, Your Honor, yes, and at trial. And there was a jury? There was a jury trial, yes, Your Honor. And the jury heard you cross-examination? Yes, Your Honor. Okay, thank you. But it's our position that he should never have been before the jury because of the inadequacies in his opinion. And if he had not been before the jury, then this damages case would have been very vastly different. The larger portion of the damages award is based upon the relationship with Pac-Chai with CRI, isn't that correct? That is correct, Your Honor. Pac-Chai had a very different proposition. There was an existing relationship, there was a history to it, there was a history of orders over a period of six years. There were intense purchasing activities six months before. That does seem to be a very different situation, does it not? That is a very different situation, Your Honor. Interestingly, for both the nonexistent relationship and the existing relationship, Mr. Feller chose a 10-year loss period. And it seems odd that he would find it 10 years for a solid relationship and 10 years for the nonexistent relationship. But in addition, although it is a very different relationship with CRI, there are also infirmities there. For example, there was a history a year before in the early 2000s of fluctuating purchases. They purchased $10,000 one year, $5,000 the next year. Mr. Feller said, well, this is a new product. I'm going to completely ignore, for purposes of how many they're going to buy, I'm going to completely ignore the old stuff. I'm not going to look at that. They're going to continue to buy what they bought for these six months for the next 10 years. Well, they seem to have been excited about this new product. They had ordered a lot of this new container and indicated they would have been interested more. Did Mr. Feller take that into consideration? He did take that into consideration. There is some email correspondence between PacGen and CRI that says, we need to know how many you're going to produce. It's very asking PacGen, is this a seasonal increase? We need to know what you're going to do. And there's no evidence of response to that. But in the early 2000s, there was excitement by CRI. I think there was one year where they purchased 10,000 units, and then the following year they purchased 5,000. It's a cyclical industry. This is the oil industry. Things go up and down in it. So he just assumed that it would continue for these six months, despite the fact that it had in the past been cyclical. In addition for CRI, he assumes a 10-year period. He assumes it's going to be the same number of sales for the 10-year period. When asked how he established this 10-year period, he said that it was a rule of thumb, which he hadn't established. But he also said that he took that from the loss of business theory because this was essentially a lost piece of business. Counsel, I have to tell you I'm having the same reaction Judge Torea had. You could argue all of this to the jury, and you did. That does not constitute an abuse of discretion in letting the jury hear this. So can we move from the Daubert to the other hearsay issue that you want to raise? Certainly, Your Honor. At trial, no one from the refineries, no one from CRI testified. Instead, people from PacGen testified that the refineries had told them that at some point in the future they would purchase. The court allowed that under the state-of-mind exception. There's no evidence of the proximity in time. In fact, we know that refineries turn over the catalyst every six months to two years. So this promise to purchase at the next turnaround at some point in the future does not fit within that exception. Because the moment in time it is said was sometime before April 2008, the event they were talking about could happen six months to two years after 2008. So it does not probably fall within that exception. Where do you find this temporal proximity rule in that rule of evidence? Is that something that you think should be applied as a matter of good sense, or is there some requirement? In the case law, Your Honor, there is a requirement of a temporal connection. For example, in Cosanto v. Life Insurance of America, the 1996 case from this court, to be admissible under the 8033 exception, a declaration, among other things, must mirror a state of mind in which, in light of all circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time. So they said they were going to purchase, but the time that they were actually going to purchase was six months to two years down the line. There's really no way to know that their intent to purchase prior to April 2008 was still going to exist in the future. There is no immediacy in this. There's no, we're going to purchase tomorrow. So my time has expired. Yes, thank you. Good morning. Good morning. Good morning, Your Honors. My name is Kurt Olson. I'm the attorney for the appellee, Pat Jen. In its brief, Barry ignores the abusive discussion standard, and even today still is ignoring it. Barry needs to show that the court made a meaningful error in judgment, and I didn't hear anything today talking about a meaningful error in judgment. In fact, we had two district court judges who approved this. The trial judge, Judge Torrison, this motion was removed at trial, and Judge Torrison, in her post-trial decision, said she fully agreed with Judge Woodcock. Barry's intention was to portray Mark Filler as someone who was unprepared and off the cuff, and the record just belies that. Barry also is basically a... In fairness, I don't think that's an accurate characterization. He did not say it was just off the cuff. He said the 1 to 10 percent is picked out of thin air. It's true it's not the 80 percent, but he needs a basis for the 10 percent. So what's your response on that? Sure. Mr. Dunn says that the 10 percent is based solely on Pac-Gen internal documents. Well, that's not true. He looked at the competitive environment that Pac-Gen was operating in. He looked at industry conditions. He considered the CADOS expert's opinion that substantial cost savings would be experienced by all of these refineries. The CADOS expert also had an opinion that Pac-Gen had excellent market presence and experience. He considered that Pac-Gen actively marketed to these refineries, and in fact winnowed the number of North American refineries down to these 37. He considered the 85 to 90 percent success rate that Pac-Gen said it would have had. He also considered the statements of intent by the refineries that they intended to buy these containers the next CADOS turnaround. The district court cited all of these facts as well as others, and we're here today to determine whether the district court made a meaningful error in judgment in doing this. And it did not. As the district court said, it would have to accept Barry's version of the facts in order to rule Mr. Fuller out, and it wasn't its job. There's a boundary between a gatekeeper under Daubert and a trier of fact. And Barry really wanted the district court to move into the trier of fact and to evaluate persuasive quality of the evidence rather than looking at the quantity of the evidence as Daubert requires. Counsel, what does this 10 percent figure actually mean? There were 37 refineries identified as having made statements of intent, which Mr. Fuller was saying that of those 37 statements of intent, 10 percent of them would have carried through to make purchases of container 3. Is that what he's saying? He's saying for purposes of his model, he needed a success rate. If this hadn't happened, where would the refineries have bought and how many would have bought? Pac-Gen said 85 to 90 percent. He rejected that. He wanted to factor in, as he stated in his testimony, he wanted to factor in possible competitors, changes in industry conditions. I'm sorry, is it 10 percent of the 37 or is it 10 percent of a larger number than the 37? As I understand it, each year his model says that Pac-Gen would have sold 10 percent of the amount of containers that it would have sold to these refineries if the incident hadn't happened. These refineries are what? You're not answering my question. Okay, I guess I didn't understand your question. It's 10 percent of what? Is it 10 percent of the 37 refineries or of a larger number? No, it's 10 percent of the needs of these 37 refineries. Does that factor in the other 100 or so refineries in North America? Okay, thank you. And so they would sell 10 percent of those needs, which was quite a bit less than what Pac-Gen himself said, which I think right there supports the 10 percent success rate. And the statements of intent also. It says that this 10 percent is not in any way based upon what might be called an external analysis of the needs of these refineries. It's based entirely on Pac-Gen's internal documents. And so, therefore, there was no basis in reason to determine from all these internal documents how these other companies were going to behave. As he describes what Mr. Filler relied upon, that seems to have some force. Does he mischaracterize what Mr. Filler relied upon to make this determination? He did not rely just on internal documents. He also relied, as I said earlier, on the catalyst expert, who said that catalyst use would be increasing over time, that these refineries would have substantial cost savings of 25 to 50 percent in the transportation and storage of catalysts. The expert also said that Pac-Gen had excellent market expertise and excellent market presence with these refineries. He also relied on the statements made by the refineries themselves. He looked at the competitive market. There are no other competitors that sell these types of containers, these intermediate bulk containers. The only competitor are full bins, these steel bins. There had been no change in the competitive environment over the years. No new competitors, no new products had come in. He also considered that Pac-Gen had actively marketed these 37 refineries. This wasn't a hope or a wish. These were refineries that Pac-Gen had repeatedly visited and exposed its product to. He also considered that CRI, who was a market leader, the largest catalyst manufacturer and largest catalyst seller, was using these cougars to deliver catalysts to the refineries and the refineries saw this. These cougars were loaded with fresh catalysts, which is the catalyst before it's used, sitting at the refineries. In effect, a market leader, CRI, had endorsed the use of these containers to store and transport catalysts. There are all these kinds of things outside of Pac-Gen's internal documents. The catalyst expert also gave opinions as to how much catalyst these refineries would use. So those numbers were used to estimate what the possible sales would have been. So that was not a number that was pulled out of there as well. Council, I just am curious. I think that this was a revolutionary new product that would have saved money for the entire industry, except it had a catastrophic failure. Has anything come along since then with the promise that this product originally had to fill that gap? There is no competing product to Pac-Gen. There's no other intermediate bulk containers out there. Pac-Gen is still selling them at a reduced rate. The test for the trial was that we feel we are finally starting to get some traction and overcome what happened eight years ago. But at this point, there are no new competitors. Pac-Gen is the only game in town for this type of container. Okay, so there's no evidence of a sort of new product that could have cut off its damages. That's correct. And that was a part of what the district court considered as well, the benefit of hindsight. At the time of trial, it had been seven and a half years since the incident. The competitive environment had not changed. No new competitors. No new products. And the district court emphasized that that reduces the amount of guesswork that has to go into any projection of lost profits. So this was not really a ten-year period. It was more like a four-year period, I think the district court says. It was four years at the time of the Dalbert hearing. By the time of trial, it was a two and a half year period. And a projection only two and a half years into the future is really a very unremarkable task for a damage expert. If there are no further questions on the Dalbert issues, I'll turn to the hearsay question. This is classic state-of-mind evidence here. That's an exception to the hearsay. And there's extensive case law that says this exception applies to customers of a business, that customers can testify or you can testify about statements of customers' intent to purchase a product. And, in fact, many cases say you can testify as to statements as to why a customer doesn't buy a product. Now, the district court didn't let us go that far because the district court felt that went to causation. But the district court did act well in her discretion by saying statements of intent just before this incident, the product failure, were admissible at trial. The objections made by Barry were, well, you didn't show us the decision maker. You didn't give names. But a district court required the decision makers, the testimony fit within that. We fulfilled all the foundational requirements that the district court insisted on. On appeal, now two other issues are being raised. They were not objected to at trial. And Barry really confuses the temporal connection here. What's required is a connection between the event that gave rise to the statements, which here was Pac-Gen talking to the decision makers, and the decision makers' expression of that intent. Now, Barry is saying, well, the intent was to buy into the future, so therefore there's no temporal connection. Well, this rule by its very nature is talking about statements of intent in the future. And the cases all say that, that the rule goes to statements to perform an act at some point in the future. So the real question here is not when they were going to buy these, but when the statement of intent was made. And the importance of that is that it cannot be a statement of memory. The decision makers cannot be testifying, well, I remember back before this product failed, I was going to buy. That doesn't fit the temporal connection. That doesn't seem to quite make sense. You're offering me these statements as proof that at some future time, the product would have been purchased, except for this product failure. If the time period within which the purchase would be made is some uncertain time in the future, that seems to dramatically reduce the appropriate value of the statement of intent. So that's got to be, it seems to me, that issue of when can the intent be carried out, that's got to be important to the invisibility of the evidence. And just to clarify, it wasn't an indefinite time in the future. It was, they stated at the next catalyst turnaround, because periodically these refineries shut down and they emptied everything out and put in new catalysts. At the next catalyst turnaround, they would buy these catalyst containers. And that turnaround could be six months or a year, and as Esselman said, even possibly as long as two years, because it depends when they had made their last turnaround. So that's not an indefinite time. I think what Barry's argument is not that it's an indefinite time, that there's not an event that triggers it. Barry's simply saying, well, geez, this was going to happen perhaps a ways into the future, so there's no temporal connection. Well, that's not the temporal connection that's required by the rule. And there was a very definite event that was going to trigger this. So what is the temporal connection? Well, the temporal connection is that the expression of the intent has to be contemporaneous with the event giving rise to that expression. Here, Pac-Chen was discussing things with these refineries. They said at that time, we intend to buy the next catalyst turnaround. So there's contemporaneity between those events. The rule contemplates that intent is always going to be an act in the future. So those things can't be contemporaneous. The act is always coming later. And here it was coming at the next catalyst turnaround. They also didn't object on this basis. They made a general hearsay objection, which does not preserve objections to Rule 8033. The only objections under Rule 8033 was you've got to provide decision makers, you've got to provide names. There was never an objection saying they can't show that there's a temporal connection here. There was never an objection on the other basis they raised on trial at law about the intent of some refineries going to all. So they just haven't preserved those issues. And I think the bottom line here is the trial judge did not make a meaningful error in judgment. She excluded the causation testimony, statements of why they did the buy. She allowed the pre-incident intent and restricted it just to that and required decision makers, the people who knew what was going on and were actually making these purchases, that it had to be them. It couldn't be other refinery employees. We met all those foundational requirements. There were no objections in anything else. And if there had been an objection on other things like temporal connection, then we would have had a chance to cure it if there was a lack of foundation. And the trial judge would have had a chance to cure her rulings as well. Now if there's nothing further, thank you, Your Honors. Thank you. I'm going to take this in reverse order. First of all, the objection were preserved. We objected on hearsay grounds to offer adequate statements for the truth of the matter asserted. It was hearsay. The rule actually says that to preserve it, sorry, I'm looking at the wrong site, that you have to have a specific round of objection if the specific round is not apparent from the context where you're objecting to state of mind evidence here. The state of mind requires proximity. It was obvious from the context that you needed proximity. So we would say that it was preserved. In terms of what Mr. Filler relied on, they said they relied on their materials expert, or the refinery expert. Mr. Filler testified that he didn't read Mr. Berman's opinions until after he had calculated his opinion. He was apprised of them, but he had never actually seen or read those opinions until after the designation, and that's in the appendix of page 135. So he didn't actually really have that before him. And while there is no product, there's also haven't been any additional failures, and still CRI is not buying. There have been additional failures. Those additional failures, though, in fact, Mr. Berman testified at trial, one was because one froze a defect in the product. And what Mr. Filler didn't look at is he was looking at the price. But this is a very, very dangerous industry, and the issue is not just price, it's safety. And if the refineries are concerned that the colluders will fail, and a lot of them fail due to user error at the refineries, that's a problem. And so we would posit that it's not that he was unprepared, but that he didn't do the difficult and time-consuming work necessary. Thank you. Thank you.